UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CRIMINAL NO. 07-189 (JRT/JSM) |
| Plaintiff, | |
| v. | REPORT AND RECOMMENDATION |
| JOHNNIE JOE LONGS (16), | |
| Defendant. | |

JANIE S. MAYERON, United States Magistrate Judge

The above matter came on before the undersigned upon defendant Johnnie Joe Longs' Motion to Suppress Evidence [Docket No. 662].

W. Anders Folk, Assistant United States Attorney, appeared on behalf of the United States of America; Brian N. Toder, Esq. appeared on behalf of defendant Johnnie Joe Longs, who was personally present. The matter was referred to the undersigned by the District Court for a Report and Recommendation pursuant to 28 U.S.C. § 636 (b)(1)(B).

Based upon the pleadings, the pre-hearing submissions, exhibits submitted at hearing on May 5, 2008, and testimony taken from Sergeant Ronald Stenerson and Sergeant Steve Mosey, it is recommended that defendant Johnnie Joe Longs' Motion to Suppress Evidence [Docket No. 662] be DENIED.

**I.    FACTUAL BACKGROUND**

At the hearing on the motions on May 5, 2008, Sergeant Steve Mosey of the Minneapolis Police Department testified to the following facts.

1

On February 24, 2005, Sergeant Mosey and Sergeant Stenerson were working with a multi-agency task force that was assigned with locating and arresting juveniles and adults wanted on active arrest warrants. They and other officers went to a home at XXXX Sixth Street in an effort to arrest an individual with an outstanding warrant. Tr. 26. The task force team knocked on the door and were met by a female. Tr. 27. Sergeant Stenerson identified himself and explained the mission of the task force, and the woman gave the officers permission to enter the house to further speak with her and look around. Tr. 27-28. The officers were either dressed in uniform or raid gear marked "police." Tr. 28. The officers were also armed, but their weapons were holstered. Tr. 28. After gaining the female's consent to enter the house, the officers asked the female if there were any males present in the house, because the target of their arrest warrant was a man. Tr. 29. The woman stated there was a male in the bedroom, and after directing the officers to a bedroom, she gave the police access to the bedroom. Tr. 29.

When Sergeant Mosey entered the bedroom, he observed a male in the bed, with the bedcovers pulled up around his neck. Tr. 29. Sergeant Mosey also noticed that the room was very neat, with female clothes and baby clothes and baby items in the room. Tr. 29. Sergeant Mosey saw no signs that the male had been asleep. To the contrary, he appeared wide awake. Tr. 30. As the officers spoke with the man, he did not move and the covers remained pulled up under his chin. Tr. 30. Sergeant Mosey testified that he found this suspicious because it looked as though the man was trying to hide his identity or maybe hide a weapon. Tr. 30. At that point, Sergeant Mosey could not see what the male was wearing or if he was holding anything in his hands. Tr. 30. For Sergeant Mosey's safety, he asked the man to undo the covers and get out of bed.

Tr. 31. The man sat up on the edge of the bed, and Sergeant Mosey could see that he was fully clothed with his shoes on. Sergeant Mosey also noticed a man's jacket lying on the bed right next to the man. Tr. 31, 37. Sergeant Mosey testified that the fact that the man was in the bed with clothes and shoes on further raised his suspicion that he was trying to hide some kind of weapon or hide his identity. Tr. 31. Sergeant Mosey asked the man if he had any identification on him in order to ascertain whether he was the individual they were seeking. Tr. 31. The male stated he had no identification on his person, and Sergeant Mosey gave a quick pat of his outer clothing to make sure he had no obvious wallet or identification or weapon on him. Tr. 31-32. Sergeant Mosey then reached for the jacket that was on the bed and squeezed the pockets to check for an obvious wallet or hard identification. Sergeant Mosey checked the jacket to see if the individual was the wanted person, and for officer safety reasons, he wanted to make sure there were no weapons in the jacket. Tr. 32. At the time, the man was not handcuffed or placed under arrest and the weapons of the officers in the room were still holstered. Tr. 32.

When Sergeant Mosey checked the jacket, he felt a piece of plastic and a hard chunk inside the plastic that was irregular inside one of the pockets, which he suspected from his experience and training to be crack cocaine. Tr. 33. After Sergeant Mosey felt this item, and without telling the man what he had felt in the jacket, he asked the male if the jacket was his, and he stated that it was not. Tr. 33, 34. As it was February and probably less than 20 degrees outside, Sergeant Mosey commented to the man that it was cold to be running around without a jacket, and the individual said he did not have a jacket and that the car in which he had arrived was warm. Tr. 34.

3

The individual was ultimately placed under arrest and identified as defendant. Tr. 34. Prior to checking the jacket for identification and performing the pat search, the individual was never physically restrained or held at gunpoint. Tr. 35.

Sergeant Mosey testified that he did not ask defendant to check the jacket himself because Sergeant Mosey did not know whether there were any weapons in the jacket. Tr. 35. In Sergeant Mosey's training and experience, it is common to come into contact with individuals carrying weapons, and common for them to keep weapons in an outer garment such as a jacket. Tr. 35. It is also common for individuals to deny having identification in the course of a warrant detail because they do not want to get arrested if they are the target of the investigation. Tr. 36.

Sergeant Mosey recalled a woman at the scene telling him that the jacket did not belong to defendant. Tr. 43-44. No identification was found in the jacket. Tr. 44.

At the hearing on the motions on May 5, 2008, Sergeant Ronald Stenerson of the Minneapolis Police Department also testified as to the events that occurred on February 24, 2005. Sergeant Stenerson testified that he supervised the adult apprehension team involved in the apprehension of defendant, but that he had no independent recollection of the events of that day. Tr. 7. Sergeant Stenerson authored a report detailing defendant's arrest, which was introduced into evidence as Defendant's Exhibit A. The report indicated that the person detained at the scene matched the description of the person sought for the arrest warrant, and that person was arrested. Tr. 10. That person was defendant Johnnie Joe Longs. Tr. 10.

4

## II.  DISCUSSION

Defendant argued that the search of the jacket violated his Fourth Amendment rights because he was illegally seized without reasonable suspicion of criminal activity or probable cause.  Def. Mem., p. 2 [Docket No. 664].  Defendant claimed that he was seized at the moment police approached him while he was in the bed, and they had no articulable suspicion that he was involved in criminal activity to justify his seizure.  Id., pp. 2-3.  Defendant therefore asked that all evidence taken after his seizure be suppressed on grounds that it was the "fruit of the poisonous tree."  Id., p. 5.

In response, the Government contended that defendant lacked standing to challenge the seizure of the jacket because he denied ownership in the jacket, or alternatively, even if the jacket belonged to defendant, he had abandoned any interest in it.  Gov't Mem, pp. 6-7 [Docket No. 678].  Further, the Government claimed that Sergeant Mosey's check of the jacket found on the bed was made pursuant to a valid Terry stop and was not a custodial search.  Id. at p. 12.

This Court concludes that defendant's motion to suppress should be denied. First, defendant had no legitimate expectation of privacy in the jacket and as such lacks standing to challenge the seizure of the evidence found inside of the jacket.  Second, even if defendant had standing to object to the search and seizure of his jacket and its contents, this search was incident to a valid detention of defendant.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and it requires probable cause for lawful searches and seizures.  U.S. Const. amend. IV; see also Illinois v. Gates, 462 U.S. 213, 230, 235 (1983).

5

In order to assert violation of Fourth Amendment rights against search and seizure, a party must be able to demonstrate a legitimate expectation of privacy in the area searched or items seized. United States v. Green, 275 F.3d 694, 698 (8th Cir. 2001). See also United States v. Muhammad, 58 F.3d 353, 355 (8th Cir. 1995) (finding that a defendant has burden of proving a legitimate expectation of privacy in the place or thing searched before defendant can challenge the search); United States v. Gomez, 16 F.3d 254, 256 (8th Cir. 1994) ("the defendant moving to suppress has the burden of proving a reasonable expectation of privacy in the area searched") (citation omitted); United States v. Kiser, 948 F.2d 418, 423 (8th Cir. 1991) (string citation omitted) (finding that a defendant "bears the burden of proving he had a legitimate expectation of privacy that was violated by the challenged search and seizure").

Here, defendant told Sergeant Mosey that the jacket did not belong to him, the woman stated the jacket did not belong to defendant, and there was no identification located in the jacket to suggest that the jacket belonged to defendant. Defendant also stated that he had not worn a jacket to the residence. Therefore, lacking evidence of ownership of the jacket, defendant has no basis to argue an expectation of privacy in the jacket, and if he did not own the jacket, he cannot challenge its search and seizure, as he has no possessory or privacy interest in it. See Gomez, 16 F.3d at 256 (ownership, possession and/or control of the area searched or item seized is relevant to the analysis of whether a person has a legitimate expectation of privacy).

Further, the Court agrees with the Government that even if defendant owned the jacket, by abandoning it, he relinquished any right to privacy he had in it. "The warrantless seizure of abandoned property does not violate the Fourth Amendment."

6

United States v. Segars, 31 F.3d 655, 658 (8th Cir. 1994) (citing Abel v. United States, 362 U.S. 217, 241, 80 S.Ct. 683, 698, 4 L.Ed.2d 668 (1960)).  This is because when an individual voluntarily abandons property, they relinquish any expectation to privacy they might have had in the property.  See Segars, 31 F.3d at 658 (quoting United States v. Jones, 707 F.2d 1169, 1172 (10th Cir.), cert. denied, 464 U.S. 859, 104 S.Ct. 184, 78 L.Ed.2d 163 (1983)).  In ascertaining whether property has been abandoned, this Court must look to the totality of circumstances available to law enforcement officers, including whether there was a verbal denial of ownership and physical relinquishment of the property.  See United States v. Liu, 180 F.3d 957, 960 (8th Cir. 1999) (citing United States v. Landry, 154 F.3d 897, 899 (8th Cir. 1998), cert. denied, 525 U.S. 1086, 119 S.Ct. 836, 142 L.Ed.2d 692 (1999) (8th Cir. 1999); see also Segars, 31 F.3d at 658 ("An expectation of privacy is a question of intent, which 'may be inferred from words spoken, acts done and other objective facts.'") (citations omitted).

Defendant was not wearing the jacket, he was not touching the jacket, and when asked if the jacket was his, he verbally denied ownership of the jacket.  By these actions, even if the jacket did in fact belong to defendant, he effectively abandoned it and subsequently relinquished any expectation to privacy he might have had in the jacket.[1]  Therefore, defendant has no standing to challenge the seizure of the jacket or the evidence derived from the jacket.

Finally, even if defendant did have standing to object to the seizure of the jacket and its contents, the Court finds that the seizure was incident to a valid detention by

---

[1] The fact that defendant was being questioned by police does not render his abandonment of the jacket involuntary.  See Segars, 31 F.3d at 658 ("'The existence of police pursuit or investigation at the time of abandonment does not of itself render the abandonment involuntary.'") (quoting Jones, 707 F.2d at 1172).

7

officers because they had reasonable suspicion that defendant was involved in criminal activity.

"The word 'seizure' readily bears the meaning of a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful." California v. Hodari D., 499 U.S. 621, 626, 111 S.Ct. 1547 (1991). To constitute seizure of a person, there must be either application of physical force or submission to an officer's show of authority to restrain the subject's liberty. Id. at 626. Circumstances that might indicate when a stop becomes a seizure include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." United States v. White, 81 F.3d 775, 779 (8th Cir. 1996); see also United States v. Hathcock, 103 F.3d 715, 718-19 (8th Cir. 1997) (citation omitted)). "[T]o determine whether a particular encounter constitutes a seizure, [the court] considers all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that he was not free to decline the officers' requests or otherwise terminate the encounter." United States v. Ward, 23 F.3d 1303, 1305 (8th Cir. 1994) (citation omitted).

Here, officers were present in the bedroom with defendant, and all were dressed in uniform or raid gear. Although their weapons were holstered, they were all armed. No one touched defendant or applied any physical force; however, defendant's liberty was restrained by the officers' authority. Defendant was lying in a bed while the officers

8

were standing, and a reasonable person in defendant's position would not have felt free to terminate the encounter and leave the room.

Nonetheless, the Court concludes that the seizure of defendant was lawful because it was supported by a reasonable suspicion that he had been or was engaging in criminal activity.

An investigatory detention is exempt from the Fourth Amendment's requirements that a seizure of a person be made pursuant to a warrant or predicated on probable cause.  See United States v. Ortiz-Monroy, 332 F.3d 525, 528 (8th Cir. 2003) (citing Terry v. Ohio, 392 U.S. 1, 21-22, 88 S.Ct. 1876, 1879-80, 20 L.Ed.2d 889 (1968)). "A Terry investigatory stop allows an officer to briefly to detain a citizen if the officer has reasonable suspicion that 'criminal activity may be afoot.'" Ortiz-Monroy, 332 F.3d at 528 (quoting Terry, 392 U.S. at 30, 88 S.Ct. at 1884); see also United States v. Johnson, 326 F.3d 1018, 1022 (8th Cir. 2003) (citation omitted) ("[A] law enforcement officer may stop and briefly question an individual if the officer has a reasonable suspicion that the person has committed or is about to commit a crime."). "[I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Terry, 392 U.S. at 21; see also United States v. Poiter, 818 F.2d 679, 683 (8th Cir. 1987) (finding that to pass Fourth Amendment scrutiny, a Terry-type stop must be based on a reasonable articulable suspicion of criminal activity, rather than mere conjecture or hunches.  In deciding whether the requisite degree of suspicion exists, we view the agents' observations as a whole. . . ."). In assessing the reasonableness of the action, "it is imperative that the facts be judged against an

objective standard: would the facts available to the officer at the moment of the seizure 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" Terry, 392 U.S at 21-22 (citations omitted).

The Court finds that Sergeant Mosey had reasonable, articulable suspicion to detain defendant. Defendant fit the description of the individual the officers had gone to the residence to arrest. Defendant was in bed, with the covers pulled up to his chin, he was not moving, and he did not appear to have been sleeping. The bedroom contained women's and children's clothing. Sergeant Mosey could not see what defendant was wearing or what was in his hands. When ordered to remove the bedcovers, defendant was fully dressed and was wearing shoes. It was reasonable for the officers to believe criminal activity was afoot.

Furthermore, Sergeant Mosey was entitled to pat down defendant and the jacket due to his concerns for officer safety. Protective searches for weapons are constitutional, without probable cause, "'where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous.'" United States v. Davis, 202 F.3d 1060, 1061-62 (8th Cir. 2000) (citations omitted). "[T]he officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.'" United States v. Roggeman, 279 F.3d 573, 578 (8th Cir. 2002) (quoting Terry v. Ohio, 392 U.S. at 27).

10

Sergeant Mosey was unable to see what was beneath the bedcovers, or inside the jacket, and the jacket was within reach of defendant on the bed. Furthermore, defendant matched the description of the individual they were seeking to arrest. See United States v. Bustos-Torres, 396 F.3d 935, 943 (8th Cir. 2005) ("'When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others,' the officer may conduct a pat-down search 'to determine whether the person is in fact carrying a weapon.'") (quoting Terry v. Ohio, 392 U.S. at 24)); see also Roggeman, 279 F.3d 573, 577 (8th Cir.) cert. denied, 537 U.S. 879(2002) (finding that the pat-down search was justified by an officer's reasonable suspicion that defendant might have been armed and dangerous).

For these reasons, the Court finds that the seizure of defendant was supported by reasonable, articulable suspicion that he was engaged in criminal activity. Consequently, the pat search and search and seizure of the jacket were valid.

### III. RECOMMENDATION

For the reasons set forth above, it is recommended that defendant Johnnie Joe Longs' Motion to Suppress Evidence [Docket No. 662] be DENIED.

Dated: May 23, 2008

*s/ Janie S. Mayeron*
JANIE S. MAYERON
United States Magistrate Judge

11

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties on or before May 30, 2008 a copy of this Report, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection.